# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | |
|---|---|
| FABRIZIO MORELLI, derivatively on behalf of COMPASS MINERALS INTERNATIONAL, INC., | |
|      Plaintiff, | Civil Action No. |
|      vs. | |
| FRANCIS J. MALECHA, JAMES D. STANDEN, ANTHONY J. SEPICH, KEVIN S. CRUTCHFIELD, RICHARD P. DEALY, EDWARD C. DOWLING, JR., ERIC FORD, GARETH JOYCE, MELISSA M. MILLER, JOSEPH E. REECE, LORI A. WALKER, PAUL S. WILLIAMS, AMY J. YODER, VALDEMAR L. FISCHER, RICHARD S. GRANT, DAVID J. D'ANTONI, and ALLAN R. ROTHWELL, | **DEMAND FOR JURY TRIAL** |
|      Defendants, | |
|      and | |
| COMPASS MINERALS INTERNATIONAL, INC., | |
|      Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Fabrizio Morelli ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Compass Minerals International, Inc. ("Compass Minerals" or the "Company"), files this Verified Shareholder Derivative Complaint against Francis J. Malecha ("Malecha"), James D. Standen ("Standen"), Anthony J. Sepich ("Sepich"), Kevin S. Crutchfield ("Crutchfield"), Richard P. Dealy ("Dealy"), Edward C. Dowling, Jr. ("Dowling"), Eric Ford ("Ford"), Gareth Joyce ("Joyce"), Melissa M. Miller ("Miller"), Joseph E. Reece ("Reece"), Lori A. Walker ("Walker"), Paul S. Williams ("Williams"), Amy J. Yoder ("Yoder"),

Valdemar L. Fischer ("Fischer"), Richard S. Grant ("Grant"), David J. D'Antoni ("D'Antoni"), and Allan R. Rothwell ("Rothwell") (collectively, the "Individual Defendants," and together with Compass Minerals, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Compass Minerals, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution against Defendants Malecha, Standen, and Sepich under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Compass Minerals, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Compass Minerals' current and former directors and officers from October 31, 2017 until October 21, 2022, both dates inclusive (the "Relevant Period").

2.     Compass Minerals, headquartered in Overland Park, Kansas, provides essential minerals, such as salt products for roadway deicing, and plant nutrition products to improve the quality and yield of crops. The Company's products have numerous other applications across the consumer, industrial, chemical, and agricultural industries as well. During the Relevant Period,

Compass Minerals had three business segments: Salt, Plant Nutrition North America, and Plant Nutrition South America. Of these three segments, the Salt segment was by far the largest, responsible for about 60% of Compass Minerals' consolidated revenues during the Relevant Period. In addition to roadway deicing, Compass Minerals' salt products are used both by consumers and professionals, as an ingredient in chemical production, for water treatment, for human and animal nutrition, and for a variety of other consumer and industrial uses.

3.      Self-styled as Compass Minerals' "crown jewel," the Salt segment operates the largest underground rock salt mine in the world in Goderich, Ontario, Canada ("Goderich Mine"). During the Relevant Period, the Goderich Mine made up about on third of Compass Minerals' total earnings.

4.      Before the beginning of the Relevant Period, the Individual Defendants announced that Compass Minerals was investing in the Goderich Mine to transition the mine from traditional "drilling-and-blasting" to continuous mining and continuous haulage ("CMCH"), which uses complex machinery to cut salt from the face of the rock and transport it for processing. The CMCH upgrade was mostly intended to reduce costs and improve profitability. In late 2014, Compass Minerals predicted the project would cost $70-to-$80 million and, after it was completed, would cut the unit cost at the Goderich Mine by more than 23%, providing Compass Minerals with about $30 million in yearly savings, starting in 2018.

5.      However, during 2016 and 2017, the Company encountered several issues with the implementing CMCH, causing the project to not reduce costs for the Company or improve operating results. Despite the $30 million cost-savings model being calculated on the Goderich Mine producing 7.5 million tons of salt annually, during 2016, the CMCH equipment produced approximately 1.4 million tons of salt. These dramatic shortfalls caused the Company to incur

significant expenses, including for purchasing salt from third parties, and for shipping salt from its salt mine in Louisiana to northern markets which were normally serviced by the Goderich Mine. Additionally, despite the Company declaring that unit costs at the Goderich Mine would start to fall by the first quarter of 2017, unit costs rose more than 42%.

6.      Indeed, through the first three operating months of 2017, the CMCH system at the Goderich Mine produced less than half of the salt required to reach the $30 million in yearly savings touted by the Individual Defendants. To this end, another CMCH machine that the Company needed to increase production at the Goderich Mine was about nine months behind schedule to be installed, while the CMCH equipment that had already been installed at the Goderich Mine was taking much longer to ramp up than the Company had anticipated.

7.      In April 2017, these extensive problems caused the Individual Defendants to reassess their $30 million cost-savings projection. The reevaluation stated that even if the CMCH equipment could produce 7.5 million tons of salt per year, the direct annual savings from CMCH would just amount to about $18 million. Certain of the Individual Defendants, including Defendant Malecha, the Company's Chief Executive Officer ("CEO") at the time, reviewed the revised projection but nevertheless decided that Compass Minerals would continue to publicly misrepresent the true figures by publicly reiterating that CMCH would cause $30 million in yearly cost savings. Indeed, after this moment, certain of the Individual Defendants continued to publicly represent the $30 million cost-savings forecast despite having reviewed periodic internal reports which maintained that the Goderich Mine was still falling short of the production levels needed to support the cost-savings model.

8.      On February 14, 2018, the Individual Defendants announced that the $30 million in yearly cost-savings from CMCH would not be achieved until 2019, instead of 2018, yet

remained stout that CMCH would eventually save the Company $30 million annually. During this time, the Individual Defendants also represented that the delayed savings was because of a "ceiling fall" incident occurring at the Goderich Mine in September 2017, in addition to salt "quality issues" which they maintained were due to the Goderich Mine's geology, but, in reality, were partly due to the CMCH equipment producing salt that was finer than the salt previously produced by drill-and-blast mining.

9.　　The Individual Defendants represented that CMCH had "already achieved about $5 million of savings in 2017," despite internal documents indicating that CMCH had allowed Compass Minerals to cut costs by only $1.1 million in 2017, with even those measly savings not even offsetting the higher expenses occurring at the Goderich Mine because of CMCH. In February 2018, the Individual Defendants further represented that the Goderich Mine's "annual production capacity" was eight million tons of salt. Yet, at that time, the CMCH system was not capable of mining anywhere close to that amount of salt per year.

10.　　On May 2, 2018, the Individual Defendants continued maintain that the ceiling fall was the reason behind the Company's poor Salt segment performance, asserting that the ceiling fall had affected the Company's earnings for the first quarter of 2018 by $20 million. However, the direct costs stemming from the ceiling fall incident had affected the Company's Q1 2018 earnings by only $3 million, with $17 million due to operating problems continuing to occur at the Goderich Mine.

11.　　On August 6, 2018, the Individual Defendants stated there were "production constraints" at the Goderich Mine, but attributed them—falsely—to a labor strike at the Goderich Mine. The Individual Defendants made these representations despite knowing that only 20% of the 2017 production shortfall at the Goderich Mine was because of the ceiling fall and only 31%

of the 2018 production shortfall was because of the labor strike, leaving the large remainder of the production shortfalls in 2017 and 2018 caused by the underperformance of the CMCH system.

12.    On September 12, 2018, the Individual Defendants stated that the Goderich Mine was "about 75% of the way to" its targeted production rate of 600,000 tons per month, thereby suggesting that the Goderich Mine was producing approximately 450,000 tons of salt per month at that time despite internal production reports maintaining that the Goderich Mine would produce less than 225,000 tons of salt for that month.

13.    Between May 2018 and September 2018, the Individual Defendants maintained on various occasions that the Company had "realized" about $15 million in annualized cost-savings in the Salt segment, despite not revealing that the "savings" were more than offset by higher expenses at the Goderich Mine related to CMCH.

14.    On October 23, 2018, the truth began to emerge when Compass Minerals revealed that CMCH did not produce any cost-savings for the Company. Indeed, a disclosure that day revealed that disappointing salt production rates at the Goderich Mine had caused a estimated "negative impact of $15 million to third-quarter 2018 Salt segment earnings," which eviscerated the $15 million in annualized savings that the Company had "realized" in the Salt segment.

15.    On this news, the price per share of Compass Minerals stock fell $13.19, or 19%, from closing at a price of $67.89 per share on October 22, 2018, to close at a price of $54.70 per share on October 23, 2018. The price per share of Compass Minerals stock fell $7.46 the following trading day, from closing at a price of $54.70 per share on October 23, 2018, to close at a price of $47.24 per share on October 24, 2018.

16.    Slightly less than a month later, on November 19, 2018, the truth continued to emerge when Compass Minerals revealed that Defendant Malecha was terminated, effective

immediately. Market analysts referenced "the severity of the issues at Goderich . . .." as a cause of his termination.

17.     On this news, the price per share of Compass Minerals stock fell $1.00, from closing at a price of $52.50 per share on November 16, 2018, to close at a price of $51.50 per share on November 19, 2018. The price per share of Compass Minerals stock continued to drop over the ensuing two trading days, closing at $48.34 per share on November 21, 2018.

18.     On November 6, 2019, the Company revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."

19.     On September 23, 2022, the truth continued to emerge when the SEC issued an order, along with a press release titled: "SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt Mine." The press release revealed that the Company would pay $12 million to settle the charges and had agreed "to cease and desist from further violations" of the federal securities laws.

20.     On October 22, 2022, the truth fully emerged when a putative federal securities class action lawsuit was filed against the Company and Defendants Malecha, Standen, and Sepich in the United States District Court for the District of Kansas, captioned *IBT Employer Group Welfare Fund v. Compass Minerals International, Inc. et al.*, case no. 2:22-CV-02432 ("Securities Class Action"). On December 12, 2023, the Securities Class Action partially survived a motion to dismiss.

21.     On this news, the price per share of Compass Minerals stock fell $0.07, from closing at a price of $40.06 per share on October 21, 2022, to close at a price of $39.99 per share on October 24, 2022.

22.     Throughout the Relevant Period, in breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the transition to CMCH machinery at the Goderich Mine saddled the Company with higher operating costs instead of saving the Company money; (2) to disguise the foregoing, the Individual Defendants blamed the heightened costs on unrelated incidents such as the September 2017 ceiling fall; (3) the CMCH system at the Goderich Mine could not produce the tonnage of salt required to meet the cost savings figures heralded by the Individual Defendants during the Relevant Period; (4) as a result, the Individual Defendants materially overstated the annual production capabilities of the Goderich Mine and the annual cost savings that could be generated from CMCH mining at the Goderich Mine; (5) the alleged cost savings generated during the Relevant Period were triggered by unrelated projects occurring at the Goderich Mine, not by CMCH-style mining; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

23.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales, netting aggregate proceeds exceeding $99,000.

24.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to the Securities Class Action and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses

due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because

Compass Minerals is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

30.    Plaintiff is a current shareholder of Compass Minerals. Plaintiff has continuously held shares of Compass Minerals common stock at all relevant times.

**Nominal Defendant Compass Minerals**

31.    Compass Minerals is a Delaware corporation with principal executive offices at 9900 W. 109TH Street, Suite 100, Overland Park, Kansas, 66210.  Compass Minerals common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CMP."

**Defendant Malecha**

32.    Defendant Malecha served as Compass Minerals' CEO, President, and as a Company director from 2013 until November 19, 2018.

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Malecha made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 12, 2018 | 1,572 | $63.21 | $99,366 |

Thus, in total, before the fraud was exposed, he sold 1,572 shares of Company stock on inside information, for which he received approximately $99,36 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Standen**

34.     Defendant Standen served as the Company's CFO from October 31, 2017 until November 18, 2018.

**Defendant Sepich**

35.     Defendant Sepich served as Senior Vice President, Salt segment from October 31, 2017 until November 18, 2018.

**Defendant Crutchfield**

36.     Defendant Crutchfield served as the Company's President, CEO, and as a Company director from May 2019 until January 2024.

**Defendant Dealy**

37.     Defendant Dealy has served as a Company director since May 2022. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee.

**Defendant Dowling**

38.     Defendant Dowling has served as a Company director since March 2022 and has served as the Company's President and CEO since January 2024.

**Defendant Ford**

39.     Defendant Ford served as a Company director from August 2011 until August 10, 2023. He also served as the Chair of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee.

**Defendant Joyce**

40.     Defendant Joyce has served as a Company director since October 2021. He also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee.

**Defendant Miller**

41.     Defendant Miller has served as a Company director since July 2022. She also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee.

**Defendant Reece**

42.     Defendant Reece has served as a Company director since March 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

**Defendant Walker**

43.     Defendant Walker has served as a Company director since 2015. She also serves as the chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

**Defendant Williams**

44.     Defendant Williams served as a Company director from June 2009 until February 15, 2023. He also served as a member of the Nominating and Corporate Governance Committee and as the Chair of the Compensation Committee.

**Defendant Yoder**

45.     Defendant Yoder served as a Company director from May 2012 until February 15, 2023. During that time, she served as a member of the Audit Committee and as a member of the Compensation Committee.

**Defendant Fischer**

46.     Defendant Fischer served as a Company director from 2017 until May 2021. During

that time, he served as a member of the Audit Committee and as a member of the Compensation Committee.

**Defendant Grant**

47.     Defendant Grant served as a Company director from 2004 until his resignation in November 2021. During that time, he served as a member of the Audit Committee and as a member of the Compensation Committee.

**Defendant D'Antoni**

48.     Defendant D'Antoni served as a Company director from 2004 until May 2020. During that time, he served as a member of the Nominating and Corporate Governance Committee and as a member of the Environmental, Health, Safety and Sustainability Committee.

**Defendant Rothwell**

49.     Defendant Rothwell served as a Company director from 2006 until February 2022. During that time, he served as a member of the Audit Committee and as a member of the Environmental, Health, Safety and Sustainability Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as officers, directors, and/or fiduciaries of Compass Minerals and because of their ability to control the business and corporate affairs of Compass Minerals, the Individual Defendants owed Compass Minerals and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Compass Minerals in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Compass Minerals and its shareholders so as to benefit all shareholders equally.

51.     Each director and officer of the Company owes to Compass Minerals and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Compass Minerals, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Compass Minerals were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Compass Minerals, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Compass Minerals' Board at all relevant times.

55.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE,

the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56.    To discharge their duties, the officers and directors of Compass Minerals were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Compass Minerals were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to Compass Minerals' own Code of Ethics and Business Conduct (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Compass Minerals conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to

make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Compass Minerals and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Compass Minerals' operations would comply with all applicable laws and Compass Minerals' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to Compass Minerals and the shareholders the duty of loyalty requiring that each favor Compass Minerals' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Compass Minerals and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, directorial, and controlling positions with Compass Minerals, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Compass Minerals.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Compass Minerals was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Compass Minerals and was at all times acting within the course and scope of such agency.

## COMPASS MINERALS' CODE OF ETHICS

66.    The Code of Ethics states that the Code of Ethics applies to all employees, officers, and directors of the Company. The Code of Ethics states the following regarding maintaining accurate books and records:

> As a publicly traded company, we have the responsibility to protect the interest of our stockholders. Acting with responsibility and transparency goes hand in hand with our Core Values of Integrity and Value Creation. We create value for our stockholders by maintaining accurate business records and ensuring our financial statements accurately reflect our business, our earnings and our financial condition.

67.    Regarding the integrity of the Company's financial statements, the Code of Ethics states the following:

The integrity of our financial statements is at the center of our integrity as a company. Any actual or perceived irregularities in our financial statements must be reported to the Chief Financial Officer, Corporate Controller, General Counsel, Audit Committee Chair or the Ethics Hotline.

* * *

As a public company, it is critical that all external communications with investment analysts, the media, and investors be consistent and accurate. Public statements on our company's behalf must be made only by the appropriate source within the company.

## COMPASS MINERALS' AUDIT COMMITTEE CHARTER

68.     According to the Audit Committee Charter, the main function of the Audit Committee is to assist the Board with its oversight responsibilities pertaining to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and the independent auditor.

69.     The Audit Committee Charter delineates the duties and responsibilities of the committee as follows:

1. The Committee may, in its discretion, conduct or authorize investigations into any matters within the scope of its responsibilities and powers. The Committee will have access to all books, records, and employees of the Company.

2. The Committee will discuss with management and the independent auditor any related-party transactions brought to the Company's attention which could reasonably be expected to have a material impact on the Company's financial statements or on the independence of any members of the Board.

3. The Committee will discuss with management the Company's overall policies with respect to its risk identification, assessment and management processes. The Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures.

4. The Committee will discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

5. The Committee will request assurances from the Company's management, the Company's internal auditor and the independent auditor that the Company's foreign subsidiaries and foreign affiliated entities are in conformity with applicable legal requirements, including disclosure of insider and affiliated party transactions.

6. The Committee will periodically review the Company's insurance programs, including those relating to property, general liability and director and officer liability, with the proposed director and officer insurance program to be presented to the full Board for approval.

7. The Committee will review and discuss with the Company's management the Company's procedures for compliance with applicable laws and regulations.

8. The Committee will annually review and approve the general use of swap transactions by the Company and its subsidiaries.

9. The Committee will review and discuss with management, tax policies, accruals, developments, disputes and other related matters.

10. The Committee will sponsor periodic training for the Board on audit, accounting, financial, compliance and related matters.

11. The Committee will, at least annually, evaluate its own performance including its compliance with this Charter, and report the results of such evaluation, including any recommended changes, to the Board.

12. The Committee will, at least annually, review and reassess this Charter and submit any recommended changes for approval by the Board.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### *The Individual Defendants Claim Switching to CMCH Will Reduce Costs at the Goderich Mine*

70.     In late 2014, the Company's Board, including certain of the Individual Defendants, approved a multi-year project intended to cut the unit cost of salt mined at the Goderich Mine through investing in upgrades to the Goderich Mine's equipment and machinery. Through this project, Compass Minerals planned to convert the Goderich Mine from traditional "drill-and-blast" mining to CMCH mining. CMCH mining requires complex machinery to cut salt and transport the cut salt for processing on flexible conveyor trains.

71.     At that time, the Company anticipated that the CMCH project would cost between $70 and $80 million. Once completely implemented, the transition to CMCH would cut the unit cost of salt mined at the Goderich Mine by more than 23%, saving Compass Minerals about $27 million annually, starting in 2018.

72.     Importantly, the cost saving projections touted by the Individual Defendants were based on the assumption that the Goderich Mine would produce 7.5 million tons of salt annually under the CMCH system. In the salt mining industry, unit cost increases as volume declines, so productivity levels and overall salt output volume was vital figure in the Company's ability to cute its unit cost, and, consequently, save money.

73.     To this end, in April 2015, during an earnings conference call, Defendant Malecha represented that Compass Minerals would save "roughly about" $30 million per year, starting in 2018, because of the $70 to $80 million transition to CMCH at the Goderich Mine.

### CMCH Faces Issues and Fails to Deliver Cost Savings, Contrary to Individual Defendants' Representations

74.     Unfortunately for Compass Minerals, during 2016 and 2017, the CMCH project experienced several problems which caused the CMCH project to significantly miss the Individual Defendants' salt production estimates and cost savings. Specifically, Compass Minerals encountered issues with implementing new CMCH machines at the Goderich Mine.

75.     Starting in 2016, the Company encountered problems from the Goderich Mine's geology after uncovering a vital change in the geology of the area of the Goderich Mine. Additionally, mining operations slowed down due to increasing levels of rock and other impurities in the salt deposit, which further contributed to the CMCH system's underperformance. For instance, in 2016, the Company's newly installed CMCH machinery produced just approximately

1.4 million tons of salt, a figure much less than what the Individual Defendants had publicly represented at the time.

76.     These problems—transitioning to the CMCH system—together with other operational issues at the Goderich Mine, caused Compass Minerals to log significant costs. For instance, during the end of 2016 and the beginning of 2017, the Company bought about 250,000 tons of salt from third parties at price premiums so that the Company could fulfill its customers' contracts. Additionally, the Company paid for shipping to transport salt from the Company's Cote Blanche, Louisiana rock salt mine to the northern markets generally serviced by the Goderich Mine.

77.     The Goderich Mine's low production triggered significant increases in unit cost. Despite the Company's internal projections that the Goderich Mine's unit cost would be consistent through the first half of 2016 and then start to drop by the conclusion of the first quarter of 2017, the Goderich Mine's unit cost rose more than 42% during that time. The significant rise in unit cost was directly because of the Company's failure to implement CMCH at the Goderich Mine and due to the higher costs stemming from the CMCH transition.

78.     Importantly, the basis of the Company's cost-savings model was that CMCH at the Goderich Mine would produce 7.5 million tons of salt annually. Yet, before and during the Relevant Period, the CMCH system at the Goderich Mine was not remotely capable of producing 7.5 million tons of salt yearly.

79.     For the first three full operating months of 2017, when the Goderich Mine was transitioning from drill-and-blast mining to just CMCH mining, the CMCH system at the Goderich Mine averaged less than 260,000 tons of salt per month, or about 3.1 million tons of salt in 2017. That performance was significantly below the Company's internal projections and was under half

of the 7.5 million tons of salt required to generate $30 million in annual savings. Compounding this issue was the fact that the Company was working on adding another CMCH machine to the Goderich Mine to boost production—albeit nine months late, in November 2017.

80.    Additionally, the already-installed CMCH machines indicated that ramping up the Company's salt production would take more time than the Individual Defendants had previously disclosed. Plainly, the Company would continue to suffer from high unit costs until CMCH production ramped up so that production levels increased.

81.    Between August 2017 and October 2017, Company executives reported to the Individual Defendants that the Goderich Mine was still underproducing salt at rates much lower than what the Company claimed. Specifically, the Goderich Mine was producing less than half of the 7.5 million tons of salt on which the CMCH cost-savings model was based upon. Additionally, Company executives reported to the Individual Defendants that unit cost at the Goderich Mine remained much more elevated than anticipated.

82.    Despite these reports, the Individual Defendants continued to make materially false and misleading statements by representing that the CMCH transformation would save Compass Minerals about $30 million per year—starting in 2018.

83.    Throughout the Relevant Period, in breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the transition to CMCH machinery at the Goderich Mine saddled the Company with higher operating costs instead of saving the Company money; (2) to disguise the foregoing, the Individual Defendants blamed the heightened costs on unrelated incidents such as the September 2017 ceiling fall; (3) the CMCH system at the Goderich Mine could not produce the tonnage of

salt required to meet the cost savings figures heralded by the Individual Defendants during the Relevant Period; (4) as a result, the Individual Defendants materially overstated the annual production capabilities of the Goderich Mine and the annual cost savings that could be generated from CMCH mining at the Goderich Mine; (5) the alleged cost savings generated during the Relevant Period were triggered by unrelated projects occurring at the Goderich Mine, not by CMCH-style mining; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

84.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

**False and Misleading Statements**

***October 31, 2017 Earnings Conference Call***

85.    On October 31, 2017, Compass Minerals held an earnings conference call to discuss the Company's financial performance for the third quarter of the 2017 Fiscal Year. During the call, Defendant Malecha stated the following, in relevant part:

> While lower de-icing demand pressured salt segment results, ***we have made progress with our capital projects at the Goderich mine***.[1] I'm also glad to report that our team there has addressed all the issues related to the collapsed roof, and the mine is fully operational and ***running in line with our current production plans***.
>
> * * *
>
> ***Installation of continuous mining and haul[age] systems at the Goderich mine is also on track***, even with the partial roof collapse we experienced in September. We are currently commissioning the final continuous mining system and expect to complete this in 2017 in fourth quarter.
>
> * * *

---

[1] All emphasis is added unless otherwise noted herein.

Our cost-savings plan initiated in July as part of this overarching effort to improve our operational performance and increase efficiency. This plan to eliminate $20 million in ongoing costs in 2018 is on track. . . . ***These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich.***

*February 14, 2018 Earnings Conference Call*

86.    On February 14, 2018, Compass Minerals held an earnings conference call with analysts and investors to discuss the Company's fourth quarter of the 2017 Fiscal Year financial performance. During the call, Defendants Malecha and Standen stated that because of the "delays" in integrating CMCH at the Goderich Mine, the anticipated $30 million in annual cost-savings would not be seen until 2019, instead of 2018. Defendant Malecha represented that the Company now expected "***to achieve the $30 million run rate of savings by the end of 2018. This means that we expect the full $30 million of savings to come through in 2019*** . . .." Defendant Standen also stated: "***By the end of 2018, we expect to reach our $30 million savings run rate with 2019 being the first full year of savings***."

87.    The above statements in ¶¶85-86 made during the October 31, 2017 and February 14, 2018 earnings conference calls were materially false and misleading because, *inter alia*: (1) the Individual Defendants were aware that even if the CMCH machinery at the Goderich Mine could annually produce 7.5 million tons of salt—the figure that the $30 million cost-savings model was premised on—CMCH could not directly save Compass Minerals $30 million annually; (2) By August of the 2017 Fiscal Year, the Company's projection for direct savings per year from CMCH mining at the Goderich Mine was about only $13 million; and (3) the cost-savings model took into account other cost-savings initiatives being implemented simultaneously at the Goderich Mine which were not directly related to CMCH, in addition to other future initiatives that Compass Minerals had not even identified at the time.

88.     Also, during the February 14, 2018 earnings conference call, Defendant Malecha explained the reasons for the delayed annual cost savings from CMCH at the Goderich Mine:

> ***The continuous mining, continuous haulage projects has made important progress*** . . . . All the systems are now installed and operating below ground. And as of November, we are no longer using any drill-and-blast to mine salt in our operations there.
>
> . . . ***There have been some delays, however, ramping up the full design rates due to a couple of factors. First, we were slowed down when the groundfall happened in September. Second, we've encountered some inconsistency in the salt quality in the area where we are mining. We expect to address these quality*** issues during our normal maintenance shutdown in March.

89.     The above statements in ¶88 made during the February 14, 2018, earnings conference call were materially false and misleading because they maintained that the delayed ramp-up and delayed cost-savings were due to the occurrence of natural events, instead of because the CMCH transition at the Goderich Mine was not performing as anticipated. In reality, the September 2017 ceiling fall triggered a 300,000-ton production shortfall, only 20% of the 2017 Fiscal Year production shortfall. The vast majority of the shortfall, some 80%, was due to the underperformance of the CMCH system at the Goderich Mine. Moreover, the "inconsistency in . . . salt quality" was not only because of "the area where [the Company was] mining," but was partly because of the CMCH machinery producing salt that was finer than the salt previously produced by the drill-and-blast method of mining. Further, the Individual Defendants knew, but failed to disclose, that to "address these quality issues," the Company planned to install a $9 million filtering system that would further cut the Goderich Mine's production by about 400,000 tons annually, which would, in turn, raise unit costs in the future.

90.     Also, during the February 14, 2018 earnings conference call, an analyst asked, in relevant part, "[I]s there anything different that happened that now is delaying the cost savings

from the continuous mining outside of . . . the impurities and also the roof collapse, but is there anything else that's really just putting that off to 2019 to get the full run rate?"

91.    Defendant Malecha replied by stating the following, in relevant part:

The only thing I would say is that ***with the challenge that we have with our roof collapse*** and kind of maintaining the mine through that, that we probably have— ***we have not reduced our labor force there as quickly as we, maybe, would have anticipated prior to that by roughly a quarter***. So as Jamie mentioned earlier, we have initiated that process at the mine. ***And that is delaying some of the savings in the early part here of '18. . . .***

92.    Defendant Standen also replied, by stating the following, in relevant part:

. . . ***[A]s we went through September and experienced the groundfall***, how we really focused in on ground control for a little while. And ***that really slowed down the timing of the ramp up***. And we—because this equipment is so important to us, we just want to make sure that we've got the right focus on. So as we got through that ground control issue, now we are taking out the labor. ***And we've just basically got a delayed ramp up. That's why it's pushing it out about 6 months.***

93.    The above statements in ¶¶90-92 made during the February 14, 2018, earnings conference call were materially false and misleading because they maintained that the delayed ramp-up and delayed cost-savings were due to the occurrence of natural events, instead of because the CMCH transition at the Goderich Mine was not performing as anticipated. In reality, the September 2017 ceiling fall triggered a 300,000-ton production shortfall, only 20% of the 2017 Fiscal Year production shortfall.

94.    Also, during the February 14, 2018 earnings conference call, Defendant Standen stated the following during his prepared statement:

Let's now move to our outlook starting with salt. Looking forward to the first half of 2018, ***we expect about $25 million in short-term product cost and logistics expense.*** About half of that $25 million is related to high-cost inventory from 2017. ***Most of this cost is due to the groundfall incident at Goderich mine, last September. We also had lower-than-expected operating rates at that mine. The other half of the $25 million relates to shipping and handling. We expect to use salt from Cote Blanche to supplement the Goderich mine shortfall to fully serve***

*the market.* That is expected to increase our first half salt distribution cost by about $2.50 per ton.

Fortunately, these costs are short-term in nature, and we expect a healthy rebound in operating margins in the second half of 2018. Second half 2018 margins will also benefit from continuous mining savings at Goderich.

95.     The above statements in ¶94 made during the February 14, 2018, earnings conference call were materially false and misleading because, in reality, "[m]ost of" the anticipated increased costs and the "lower-than-expected operating rates" at the Goderich Mine, were caused by the CMCH system underperforming, not because of the September 2017 ceiling fall. In reality, the September 2017 ceiling fall triggered a 300,000-ton production shortfall, only 20% of the 2017 Fiscal Year production shortfall.

96.     Also, during the February 14, 2018 earnings conference call, Defendant Standen stated that Compass Minerals had "***already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system*** and completely stopped drilling and blasting in the fourth quarter." Defendant Malecha echoed this sentiment, stating during his prepared statement: "[***W]e have already achieved some 2017 cost savings from the continuous miners***."

97.     Also, during the February 14, 2018 earnings conference call, Defendants showed and spoke about a investor PowerPoint presentation, that stated on Slide four that the "Goderich mine installation of continuous mining and haulage systems [was] complete" and that CMCH had "***[d]elivered savings of over $5 million in 2017[.]***"

98.     The above statements in ¶¶96-97 made during the February 14, 2018, earnings conference call were materially false and misleading because the statements indicated that CMCH mining had already started saving the Company money. However, the Company's internal documents show that CMCH only reduced costs by $1.1 million for the 2017 Fiscal Year, and this

was mostly because the Company did not have to buy explosives to conduct drill-and-blast mining operations at the Goderich Mine. The other $3.9 million was saved because of other initiatives at the Goderich Mine that were not directly related to the CMCH transformation.

***2017 10-K***

99.    On February 27, 2018, the Company filed its annual report on Form 10-K with the SEC for the 2017 Fiscal Year (the "2017 10-K"), which was signed by Defendants Malecha, Standen, D'Antoni, Fischer, Ford, Grant, Rothwell, Walker, Williams, and Yoder. Attached to the 2017 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Malecha and Standen attesting to its accuracy.

100.    The 2017 10-K stated that the "[a]nnual production capacity" for the Goderich Mine was eight million tons of salt annually. The 2017 10-K defined "[a]nnual production capacity" in the following fashion:

(a) Annual production capacity is our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of our facilities under normal working conditions, including staffing levels, based on actual historical production rates. ***As we introduce new production methods, such as continuous mining at our Goderich salt mine, we will update our estimates if necessary as new production data become available***.

(b) We continue to invest in the [Goderich] mine to achieve production capacity of approximately nine million tons annually.

101.    The above statements in ¶100 made in the 2017 10-K were materially false and misleading because it exaggerated the Goderich Mine's annual production capacity during the transition to CMCH. In reality, despite the Goderich Mine producing almost eight million tons of salt per year with the drill-and-blast mining method, the Company ceased drill-and-blast mining at the Goderich Mine in the fourth quarter of 2017, and the CMCH system was not capable of mining eight million tons of salt per year during the CMCH transition period. For instance, during

2017, the Goderich Mine had produced less than 5.2 million tons of salt, 1.5 million tons less than what the Company had planned to produce. Additionally, the September 2017 ceiling fall triggered a 300,000-ton production shortfall, only 20% of the 2017 Fiscal Year production shortfall. The vast majority of the shortfall, some 80%, was due to the underperformance of the CMCH system at the Goderich Mine. Therefore, the the Goderich Mine's "[a]nnual production capacity" for 2017 was not eight million tons, and the Individual Defendants did not "updated [their] estimates . . . as new production data [became] available."

102.    The 2017 10-K also stated the following about cost savings:

> We continue to invest in our continuous mining project at our Goderich mine. We shifted all of our Goderich mine production to continuous mining in the fourth quarter of 2017, and *we expect this project to generate annual cost savings of approximately $15 million in 2018 and $30 million in 2019 if all efficiencies are realized.*

103.    The above statements in ¶102 made in the 2017 10-K were materially false and misleading because, *inter alia*: (1) the Individual Defendants were aware that even if the CMCH machinery at the Goderich Mine could annually produce 7.5 million tons of salt—the figure that the $30 million cost-savings model was premised on—CMCH could not directly save Compass Minerals $30 million annually; (2) By August of the 2017 Fiscal Year, the Company's projection for direct savings per year from CMCH mining at the Goderich Mine was about only $13 million; and (3) the cost-savings model took into account other cost-savings initiatives being implemented simultaneously at the Goderich Mine which were not directly related to CMCH, in addition to other future initiatives that Compass Minerals had not even identified at the time.

### *May 1, 2018 Press Release*

104.    On May 1, 2018, the Company issued a press release that reported the Company's financial performance for the first quarter of 2018. The press release was attached as an exhibit to

a current report the Company filed on Form 8-K that same day, which Defendant Standen signed. The press release stated the following, in relevant part:

> Salt segment operating earnings totaled $34.1 million, compared to $45.4 million in the first quarter of 2017. ***Earnings for this segment were pressured by increased logistics costs*** as well as higher-cost carryover inventory produced last year and sold in the first quarter of 2018. ***Approximately $20 million in increased logistic and production costs primarily resulted from the ceiling fall incident at the Goderich mine last year***, which led the company to use rock salt from its Louisiana mine to serve customers in the Great Lakes region in the first quarter.

***May 2, 2018 Form 10-Q***

105.    On May 2, 2018, the Company filed its quarterly report for the first quarter of 2018 on Form 10-Q with the SEC (the "Q1 2018 10-Q"). Attached to the Q1 2018 10-Q were SOX certifications signed by Defendants Standen attesting to its accuracy.

106.    The Q1 2018 10-Q stated the following about the lower Salt segment production at the Goderich Mine:

> Salt operating earnings decreased 25%, or $11.3 million, due to higher per-unit product and logistics costs as well as higher-cost inventory produced in 2017 and sold in the first quarter of 2018. ***The higher per-unit product and logistics costs resulted from lower production at our Goderich mine due to a ceiling fall that occurred last year, leading to deliveries of salt from our Cote Blanche, Louisiana mine to our Northern markets.***

107.    The above statements in ¶106 made in the Q1 2018 10-Q were materially false and misleading because the ceiling fall incident had reduced the Company's earnings by just $3 million in the first quarter of 2018. Most of the increased costs, about $17 million in costs, were the result of operating problems at the Goderich Mine during 2017. Moreover, the statement is false and misleading because the increased costs did not mostly arise from the ceiling fall incident, but because of the struggles of the CMCH system.

*May 2, 2018 Earnings Conference Call*

108.    Also on May 2, 2018, the Company hosted an earnings conference call with analysts and investors to discuss the Company's financial performance for the first quarter of 2018. During the call, Defendant Standen reiterated the effects the September 2017 ceiling fall had on the Company's poor earnings performance:

> Operating earnings for the quarter declined 25% compared to the 2017 first quarter as a result of 2 primary factors. . . . ***The second primary factor, which depressed earnings this quarter was related to the short-term costs primarily associated with the ceiling fall at Goderich mine last year. We recognized about $20 million of additional costs related to this incident***, which we previously outlined during our fourth quarter earnings call. These costs include increased unit costs as a result of lower production levels at the Goderich mine as well as the logistics cost of using salt from our Cote Blanche mine to serve customers in the Great Lakes.

109.    Also, during the May 2, 2018 earnings conference call, Defendants showed and spoke about an investor PowerPoint presentation, that stated on Slide eight that first quarter of 2018 Salt segment "margins [were] pressured by increased logistics and production costs [i]ncluding ***short term costs primarily due to [a] ceiling fall at Goderich mine, which totaled $20 million in 1Q18[.]***"

110.    The above statements in ¶¶104, 108-109 made in the May 1, 2018 press release and May 2, 2018 earnings conference call were materially false and misleading because the ceiling fall incident had reduced the Company's earnings by just $3 million in the first quarter of 2018. Most of the increased costs, about $17 million in costs, were the result of operating problems at the Goderich Mine during 2017. Moreover, the statement is false and misleading because the increased costs did not mostly arise from the ceiling fall incident, but because of the struggles of the CMCH system.

111.    Also, during the May 2, 2018 earnings conference call, Joel Jackson of BMO

Capital Markets Equity Research, asked Defendant Malecha the following question regarding salt

quality issues and CMCH equipment:

> . . . Okay, so there's been some concern that maybe with what's going on in
> Goderich and the (inaudible) of the [continuous] miners, that some of the products
> that you're selling aren't meeting [customers'] spec[ifications]. So are there any
> products right now that you're currently not able to reach spec on, how are you
> dealing with it? Has is it been fixed with the optical sorters? What are those
> products? And how might it get resolved?

112.    Defendant Malecha replied:

> . . . As we've been communicating over the past couple of quarters here, *we've had
> quality issues at the mine, but not driven by—or caused by the continuous miners,
> but more the area of the mine that we're mining in, and the geology that we're
> incurring*, is just including more off-spec products than we've ever experienced in
> the past. So to deal with that, we have put screening and sorting equipment into the
> —into operation at the mine. And we initiated and finished that project as we did
> our annual shutdown, which occurred in March. So now we're confident going
> forward that we can deal with those quality issues and effectively meet our
> customers' specs. . . .

113.    Defendant Malecha's above statements in ¶¶111-112 were materially false and

misleading because the "quality issues" with the Goderich Mine's salt were "caused" in part "by

the continuous miners" and not just because of the "geology" of the Goderich Mine. Specifically,

the CMCH machinery operating at the Goderich Mine in 2017 produced salt that was finer than

the salt previously produced by the drill-and-blast method. This CMCH produced salt was also

finer than the specifications contractually required by certain of the Company's customers. These

discrepancies caused the Company to be subject to penalties for delivering salt that did not comport

with certain customers' requirements. Moreover, Defendant Malecha's statements failed to

disclose that, in addition to the $9 million up-front cost of the "screening and sorting equipment"

that the Company had installed at the Goderich Mine to "deal with those quality issues," the

Individual Defendants knew, by mid-2017, that the CMCH machinery would cut output at the mine by about 400,000 tons annually, and in result, increase unit costs "going forward."

### May 16, 2018  BMO Capital Markets Farm to Market Conference

114.    On May 16, 2018, Defendant Standen attended the BMO Capital Markets Farm to Market Conference on behalf of the Company. During the conference, Defendant Standen asserted that Compass Minerals' higher costs in the first quarter of 2018 were due to the September 2017 ceiling fall at the Goderich Mine, stating in relevant part: "We have also been challenged by a couple of operational issues at the Goderich mine such as a *ceiling collapse which curtailed production in the fall of 2017 and resulted in higher cost salt in the first quarter of 2018*."

115.    The above statements in ¶114 made during the BMO Capital Markets Farm to Market Conference were materially false and misleading because the ceiling fall incident had reduced the Company's earnings by just $3 million in the first quarter of 2018. Most of the increased costs, about $17 million in costs, were the result of operating problems at the Goderich Mine during 2017. Moreover, the statement is false and misleading because the increased costs did not mostly arise from the ceiling fall incident, but because of the struggles of the CMCH system.

116.    Also, during the BMO Capital Markets Farm to Market Conference, Defendant Standen further stated the following, in relevant part:

> We have installed all of the continuous mining and haulage equipment and continue to ramp up toward the design rates. *We have had delays in our ramp-up, which were largely driven by salt quality issues that are being addressed through our new optical sorting.*

117.    The above statements in ¶116 made during the May 16, 2018 BMO Capital Markets Farm to Market Conference were materially false and misleading because they maintained that the delayed ramp-up and delayed cost-savings were due to the occurrence of natural events, instead of

because the CMCH transition at the Goderich Mine was not performing as anticipated. In reality, the September 2017 ceiling fall triggered a 300,000-ton production shortfall, only 20% of the 2017 Fiscal Year production shortfall. The vast majority of the shortfall, some 80%, was due to the underperformance of the CMCH system at the Goderich Mine. Moreover, the "salt quality issues" were partly because of the CMCH machinery producing salt that was finer than the salt previously produced by the drill-and-blast method of mining. Further, the Individual Defendants knew, but failed to disclose, that to address these quality issues, the Company's "new optical sorting" system would further cut the Goderich Mine's production by about 400,000 tons annually, which would, in turn, raise unit costs in the future.

118.    In the scripted portion of his presentation at the BMO Capital Markets Farm to Market Conference, Defendant Standen stated the following about projected and realized cost-savings in the Salt segment:

> With our cost savings and efficiency projects, ***we have identified approximately $40 million in annualized cost reductions within the salt segment. These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage***, as well as various other efficiency programs at this mine and throughout the other salt operations.
>
> ***We have realized about $15 million in annualized savings for this business through the first quarter of 2018. This includes broad-based streamlining in addition to some of the initial savings from the transition to continuous mining and haulage***. We expect that the remainder of these savings will be achieved mainly at Goderich.

119.    The above statements in ¶118 made during the BMO Capital Markets Farm to Market Conference were materially false and misleading because, *inter alia*: (1) the Individual Defendants were aware that even if the CMCH machinery at the Goderich Mine could annually produce 7.5 million tons of salt—the figure that the $30 million cost-savings model was premised on—CMCH could not directly save Compass Minerals $30 million annually; (2) By August of the

2017 Fiscal Year, the Company's projection for direct savings per year from CMCH mining at the Goderich Mine was about only $13 million; and (3) the cost-savings model took into account other cost-savings initiatives being implemented simultaneously at the Goderich Mine which were not directly related to CMCH, in addition to other future initiatives that Compass Minerals had not even identified at the time.

120.    During the BMO Capital Markets Farm to Market Conference, Defendant Standen also discussed Slide 9 of an investor presentation PowerPoint, which stated that the Company had "[a]chieved ~$13 million in annualized salt business savings as of end of 2017[.]"

121.    The above statements in ¶120 made during the BMO Capital Markets Farm to Market Conference were materially false and misleading because the statements indicated that CMCH mining had already started saving the Company money. However, the Company's internal documents show that CMCH only reduced costs by $1.1 million for the 2017 Fiscal Year, and this was mostly because the Company did not have to buy explosives to conduct drill-and-blast mining operations at the Goderich Mine. The other $3.9 million was saved because of other initiatives at the Goderich Mine that were not directly related to the CMCH transformation.

### June 12, 2018 Stifel Cross Sector Insight Conference

122.    On June 12, 2018, Defendant Standen attended the Stifel Cross Sector Insight Conference. During the conference, he reiterated substantially similar statements that he made a month earlier, in relevant part:

> With our cost savings and efficiency projects, *we have identified approximately $40 million in annualized cost reductions specifically for the Salt segment. These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage* as well as various other efficiency programs at this mine and throughout our entire salt operations.
>
> *We have realized about $15 million in annualized savings for this business through the first quarter of 2018. This included* broad based streamlining of the

business, in addition to **some initial savings from the transition to continuous mining and haulage at Goderich**. We expect that the remainder of these savings will be achieved mainly at Goderich. We have installed all of the continuous mining and haulage equipment and continue to ramp up toward design rates.

**We have had delays in our ramp up which were largely driven by some salt quality issues that are being addressed through our new optical sorting system** . . . .

123.    The above statements in ¶122 made during the Stifel Cross Sector Insight Conference were materially false and misleading because, *inter alia*: (1) the Individual Defendants were aware that even if the CMCH machinery at the Goderich Mine could annually produce 7.5 million tons of salt—the figure that the $30 million cost-savings model was premised on—CMCH could not directly save Compass Minerals $30 million annually; (2) By August of the 2017 Fiscal Year, the Company's projection for direct savings per year from CMCH mining at the Goderich Mine was about only $13 million; and (3) the cost-savings model took into account other cost-savings initiatives being implemented simultaneously at the Goderich Mine which were not directly related to CMCH, in addition to other future initiatives that Compass Minerals had not even identified at the time.

### August 6, 2018 Press Release

124.    On August 6, 2018, after the market closed, the Company issued a press release announcing its financial performance for the second quarter of 2018. The press release stated that despite salt demand increasing, Compass Minerals could not meet the heightened demand "due to production constraints" at the Goderich Mine, but attributed the recent 12-week strike by laborers Goderich Mine, not issues with CMCH:

> While market-wide average bid volumes have increased this season compared to the 2017-2018 season, **the company currently does not expect to increase salt sales volume expectations for 2018 due to production constraints. These constraints are due to the impact of the ongoing ramping up of production following the [12]-week strike at the Goderich mine, which included an unexpected 7-day full work stoppage near the end of the strike**.

125.    The above statements in ¶124 made in the August 6, 2018 press release were materially false and misleading because the Goderich Mine's "production constraints" were not really caused by the strike, but were rather mostly caused by the CMCH system's underperformance. Specifically, the strike only cut production by about 750,000 tons (31% of the 2018 production shortfall) while 69% of the production shortfall was caused by the CMCH system underperforming.

***August 7, 2018 Earnings Conference Call***

126.    On August 7, 2018, the Company held an earnings conference call with analysts and investors. During the call, Defendant Standen addressed the strike's impact on salt production at the Goderich Mine, stating the following, in relevant part:

> ***First I'll discuss the financial implications of the Goderich strike, including the costs we incurred and its impact on our production volumes***, which has also impacted how we approached the North American highway deicing bid season. The direct costs associated with the strike were offset by the payroll savings from our striking workforce. Therefore, ***the primary cost impact relates to reduced production levels*** at the beginning of the strike, during the unplanned work stoppage at the end of the strike, and now, as we make another transition back to our unionized employees.
>
> * * *
>
> ***These starts and stops have reduced full year production expectations at Goderich***, which puts pressure on producing salt in advance of the upcoming winter season and on our second half operating margins because of unfavorable fixed cost absorption.
>
> It's important to note that ***we plan to make up some of the production shortfall with purchased salt as well as serving some northern customers with salt from our Cote Blanche mine. We expect that most of the volume-related cost impacts from the strike will be felt throughout the second half of 2018, as we deplete this higher cost inventory***.

127.    The above statements in ¶126 made in the August 7, 2018 earnings conference call were materially false and misleading because the Goderich Mine's production shortfall was not

really caused by the strike, but was rather mostly caused by the CMCH system's underperformance. Specifically, the strike only cut production by about 750,000 tons (31% of the 2018 production shortfall) while 69% of the production shortfall was caused by the CMCH system underperforming.

128.    Also, during the August 7, 2018 earnings conference call, Defendant Malecha stated the following about the "annualized cost savings" that CMCH had allegedly "already delivered":

> The second important takeaway is that we believe we have all the pieces in place to drive more efficiency through our salt operations, and particularly, at our Goderich mine. ***Our continuous mining and continuous haulage systems at the mine are ramping up and served [us] well during the work stoppage. As we have previously reported, we estimate that this investment has already delivered approximately $5 million in ongoing annualized cost savings***.

129.    The above statements in ¶128 made in the August 7, 2018 earnings conference call were materially false and misleading because the Goderich Mine's CMCH mining had not started to generate cost savings for Compass Minerals, and any saving it had produced were more than offset by the higher costs the Company was facing to implement CMCH at the Goderich Mine anyway.

130.    Also, during the August 7, 2018 earnings conference call, Defendant Standen again asserted that the increased costs Compass Minerals was facing in the Salt segment were a product of the September 2017 ceiling fall at the Goderich Mine:

> Salt operating earnings for the quarter increased 17% from second quarter 2017 results and operating margin expanded slightly. This growth was primarily due to better-operating rates in the U.K., ***partially offset by the pull forward of costs associated with the Goderich ceiling fall last year. Recall that we had expected about $3 million of carryover logistics cost in the second half of 2018. This expense is related to the shipment of Cote Blanche salt to some of our northern markets***. With the increase in highway deicing demand in the second quarter, we ended up selling almost all of this higher cost salt, which pulled those ***additional costs into the second quarter***.

131.   The statements referenced above in ¶130 were materially misleading when made because Compass Minerals was incurring costs to ship salt from its Cote Blanche mine to northern markets, not because of the ceiling fall, but because of the ongoing production shortfalls at Goderich, which were primarily due to the underperformance of the CMCH system. Indeed, the ceiling fall caused just 20% of the 2017 production shortfall.

132.   Also, during the August 7, 2018 earnings conference call, Defendant Standen stated the following, in relevant part:

> . . . [*W]e commissioned and began full utilizing our new optical sorting and screening equipment* during the strike. Ultimately, *we believe these efforts will improve our operations as we've largely addressed the quality issues in our salt production*.

133.   Defendant Standen's above statements in ¶132 were materially false and misleading because the "quality issues" with the Goderich Mine's salt were caused by CMCH mining itself. Specifically, the CMCH machinery operating at the Goderich Mine in 2017 produced salt that was finer than the salt previously produced by the drill-and-blast method. This CMCH produced salt was also finer than the specifications contractually required by certain of the Company's customers. These discrepancies caused the Company to be subject to penalties for delivering salt that did not comport with certain customers' requirements. Moreover, Defendant Malecha's statements failed to disclose that, in addition to the $9 million up-front cost of the screening and sorting equipment that the Company had installed at the Goderich Mine to "address[] the quality issues," the Individual Defendants knew, by mid-2017, that the CMCH machinery's sorting equipment would cut output at the mine by about 400,000 tons annually, and in result, prevent the Company's capability to "improve . . . operations" at the Goderich Mine.

*September 12, 2018 Credit Suisse Basic Materials Conference*

134.    On September 12, 2018, Defendants Standen and Sepich attended the Credit Suisse Basic Materials Conference. During the conference, Defendant Sepich stated the following, in relevant part:

> Our approach to growing our salt business is to maximize the value of our salt assets by increasing our production efficiency . . . . From an efficiency perspective, ***we have taken several actions to reduce our cost. . . . Specifically, at Goderich, I'm referring to moving the entire production of the mine to a continuous mining and continuous haulage operation. We***, in fact, ended all drilling and blasting at that mine in November of 2017 and ***are now ramping up at our targeted operating rates. As of the end of the second quarter of 2018, we've achieved a run rate of $15 million in ongoing annualized savings from these efforts***.

135.    Defendant Sepich's above statements in ¶134 were materially false and misleading because CMCH mining at the Goderich Mine was raising, not "reduc[ing]," Compass Minerals' "cost." In actuality, the Goderich Mine could not and did not produce the amount salt needed— mostly due to the CMCH system not performing well—to unit costs down. In turn, the higher unit costs materially lowered Compass Minerals' earnings and income from operations and, to this end, essentially negated the "$15 million in ongoing annualized savings" that the Company had allegedly attained.

136.    Also, during the September 12, 2018 Credit Suisse Basic Materials Conference, Defendant Sepich discussed a PowerPoint slide during his presentation that featured a "Production Plan," that compared the Goderich Mine's "[c]urrent production rate" to a target rate of 600,000 tons per month:



137.     In discussing the slide that featured the above chart, Defendant Sepich stated the following, in relevant part:

> Getting to our targeted monthly production rates will determine when we start achieving the full savings we expect from these investments. ***As you can see on this chart, we're about 75% of the way to our targeted rates.*** . . .

138.     Also, during the conference, Defendant Standen stated that attaining the "cost savings" from CMCH mining would "depend[] on the timing of our full ramp-up ***as we move from 75% production at Goderich*** up to that 100% . . . ."

139.     The above statements in ¶¶136-138 were materially false and misleading because, despite the Goderich Mine producing about 438,000 tons of salt eight months earlier, in January 2018, the Company's internal production reports as of September 12, 2018 indicated that the Goderich Mine was currently producing much less than 450,000 tons of salt per month. Indeed, between April 2018 and July 2018—when mining was also affected by the 12-week laborer strike—the Goderich Mine averaged about 314,000 tons of salt produced per month. By August 2018, the Goderich Mine had produced just 332,000 tons of salt. By the time Defendants Sepich and Standen presented on September 12, 2018, the Goderich Mine was positioned to produce about only 225,000 tons of salt for the month of September 2018.

140.    Also, during the conference, Defendant Standen addressed the Salt segment's "depressed production levels," stating the following, in relevant part:

> . . . [*T]he depressed production levels, that includes the cost associated with the* carryover inventory from . . . 2017, where we had a ***ceiling fall***. ***That was approximately $25 million. The other part of that is the depressed production this year related to the strike impact. We haven't given a granular number on that, but you can impute something that's pretty material in that number. So those items would generally non-repeat***, except for any carryover inventory that we have into 2019.

141.    The above statements in ¶140 were materially false and misleading because they represented that the Goderich Mine's low production levels and higher costs were due to singular events, such as the September 2017 ceiling fall and the 2018 laborer strike, while in reality, the main driver of the low production levels was the poor performance of the CMCH system. In particular, the ceiling fall caused just 20% of the 2017 production shortfall while the laborer strike caused just 31% of the 2018 production shortfall. The large remainder of the production shortfalls were because of the CMCH system's low production, which caused higher unit costs.

## The Truth Emerges

142.    On October 23, 2018, the truth began to emerge when the Company issued a press release that revealed Compass Minerals' poor financial performance for the third quarter of 2018, among other things. The press release revealed there were "production rates at its Goderich, Ontario, salt mine [that] were lower-than-expected for the third quarter of 2018" which caused an estimated "negative impact of $15 million to third-quarter 2018 Salt segment earnings . . . ." In the press release, Defendant Malecha stated the following, in relevant part:

> "We are disappointed with our salt segment earnings, which were pressured this quarter by ***lower-than-expected production at our Goderich mine***. Our employees are making improvements each month to ramp up production ***with our new continuous mining systems***; however, ***the pace of improvement continues to be slower than expected*** since the end of the strike. Our new guidance reflects this slower ramp-up for the remainder of the year . . . ."

143.    On this news, the price per share of Compass Minerals stock fell $13.19, or 19%, from closing at a price of $67.89 per share on October 22, 2018, to close at a price of $54.70 per share on October 23, 2018. The price per share of Compass Minerals stock fell $7.46 the following trading day, from closing at a price of $54.70 per share on October 23, 2018, to close at a price of $47.24 per share on October 24, 2018.

144.    Indeed, the market was shocked by these disclosures. For instance, on October 23, 2018, a significant shareholder told the Company to "take a serious look at your original 2018 targets, and how you communicated and clung and 'aspired' since that day, and then look at the stock performance since that day and seriously ask yourself, is this any way to run a public company?" An analyst from BMO Capital Markets, that same day, lowered its price target for Compass Minerals, stating that "[i]t appears the mine will not run more smoothly until 2019."

145.    On October 24, 2018, Stephens published an analyst report reporting that: "Persistent execution and guidance issues, which caused Compass Minerals to reduce 3Q18 and FY2018 guidance, are highly disappointing." That same day, a bondholder lamented: "[B]ondholders' reliance on the Goderich mine and steady production levels seemed assured by management up until yesterday," stating that "proper communication or maybe timely understanding of production issues is very controllable by management and that is where the issues lie with [the Company]."

146.    On November 19, 2018, the truth continued to emerge when Compass Minerals revealed that Defendant Malecha was terminated, effective immediately. Market analysts referenced "the severity of the issues at Goderich . . .." as a cause of his termination.

147.    On this news, the price per share of Compass Minerals stock fell $1.00, from closing at a price of $52.50 per share on November 16, 2018, to close at a price of $51.50 per share

on November 19, 2018. The price per share of Compass Minerals stock continued to drop over the ensuing two trading days, closing at $48.34 per share on November 21, 2018.

148.    On November 6, 2019, the Company revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."

149.    On September 23, 2022, the truth continued to emerge when the SEC issued an order, along with a press release titled: "SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt Mine." The press release revealed that the Company would pay $12 million to settle the charges and had agreed "to cease and desist from further violations" of the federal securities laws.

150.    The press release stated that the Company misled the market by "repeatedly assur[ing]" them that the change to CMCH mining at the Goderich Mine "was on track to materially reduce costs and boost its operating results starting in 2018," but "failed to tell investors that costs at the mine were increasing rather than decreasing, which substantially undermined the projected savings." Compass Minerals further "misled investors by overstating the amount of salt it was able to produce at Goderich."

151.    Melissa Hodgman, the SEC's Associate Director of the Division of Enforcement, stated in the press release, the following:

> "What companies say to investors must be consistent with what they know. Yet Compass [Minerals] repeatedly made public statements that did not jibe with the facts on—or under—the ground at Goderich . . . . By misleading investors about mining costs in Canada . . . , Compass [Minerals] fell far short of what the federal securities laws require."

152.    On October 22, 2022, the truth fully emerged when the Securities Class Action was filed against the Company and Defendants Malecha, Standen, and Sepich in the United States

District Court for the District of Kansas. On December 12, 2023, the Securities Class Action partially survived a motion to dismiss.

153.    On this news, the price per share of Compass Minerals stock fell $0.07, from closing at a price of $40.06 per share on October 21, 2022, to close at a price of $39.99 per share on October 24, 2022.

## DAMAGES TO COMPASS MINERALS

154.    As a direct and proximate result of the Individual Defendants' conduct, Compass Minerals will lose and expend many millions of dollars.

155.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157.    Such expenditures also include the costs associated with and expended by the Company to restate its financial reporting for the first quarter of 2019 through the first quarter of 2021.

158.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including but not limited to the $12 million fine levied against the Company by the SEC.

159.    As a direct and proximate result of the Individual Defendants' conduct, Compass Minerals has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

160.    Plaintiff brings this action derivatively and for the benefit of Compass Minerals to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Compass Minerals, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and for contribution under Sections 10(b) and 21D of the Exchange Act.

161.    Compass Minerals is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162.    Plaintiff is, and has been at all relevant times, a shareholder of Compass Minerals. Plaintiff will adequately and fairly represent the interests of Compass Minerals in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

163.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

164.    A pre-suit demand on the Board of Compass Minerals is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Dowling, Dealy, Joyce, Miller, Reece, and Walker (the "Director Defendants") and non-parties Vance O. Holtzman and Shane Wagnon (together with the Director

Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

165.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

166.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

167.    Additional reasons that demand on Defendant Dowling is futile follow. Defendant Dowling has served as a Company director since March 2022 and has served as the Company's President and CEO since January 2024. Defendant Dowling has received and continues to receive compensation for his role as a director and as the Company's highest officer. As a trusted Company director and as the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Dowling breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Dealy is futile follow. Defendant Dealy has served as a Company director since May 2022. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee. Defendant Dealy has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Dealy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Joyce is futile follow. Defendant Joyce has served as a Company director since October 2021. He also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Joyce has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Joyce breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.     Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since July 2022. She also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Miller has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.     Additional reasons that demand on Defendant Reece is futile follow. Defendant Reece has served as a Company director since March 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Reece has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Reece breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.     Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since 2015. She also serves as the chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant

has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Furthermore, Defendant Walker signed, and thus personally made, the false and misleading statements and omissions in the 2017 10-K. For these reasons, Defendant Walker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173.   Additional reasons that demand on the Board is futile follow.

174.   Defendants Dealy, Reece, and Walker served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Dealy, Reece, and Walker failed to adequately review and discuss the Company's Forms 10-K and 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Dealy, Reece, and Walker, further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

175.   In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply

with all applicable laws, rules, and regulations, and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

176.    Compass Minerals has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Compass Minerals any part of the damages Compass Minerals suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

177.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

178.    The acts complained of herein constitute violations of fiduciary duties owed by Compass Minerals' officers and directors, and these acts are incapable of ratification.

179.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Compass Minerals. If there is a directors' and

officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Compass Minerals, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

180.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Compass Minerals to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

181.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Compass Minerals' business and affairs.

184.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

185.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Compass Minerals.

186.    In breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the transition to CMCH machinery at the Goderich Mine saddled the Company with higher operating costs instead of saving the Company money; (2) to disguise the foregoing, the Individual Defendants blamed the heightened costs on unrelated incidents such as the September 2017 ceiling fall; (3) the CMCH system at the Goderich Mine could not produce the tonnage of salt required to meet the cost savings figures heralded by the Individual Defendants during the Relevant Period; (4) as a result, the Individual Defendants materially overstated the annual production capabilities of the Goderich Mine and the annual cost savings that could be generated from CMCH mining at the Goderich Mine; (5) the alleged cost savings generated during the Relevant Period were triggered by unrelated projects occurring at the Goderich Mine, not by CMCH-style mining; (6) the Company failed to maintain internal controls; and (7) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

187.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

188.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales.

189.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Compass Minerals' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

190.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Compass Minerals has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.    Plaintiff, on behalf of Compass Minerals, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Compass Minerals.

195.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Compass Minerals that was tied to the performance or artificially inflated valuation of Compass Minerals or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

196.    Plaintiff, as a shareholder and a representative of Compass Minerals, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

197.    Plaintiff, on behalf of Compass Minerals, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Compass Minerals, for which they are legally responsible.

200.    As a direct and proximate result of the Individual Defendants' abuse of control, Compass Minerals has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty,

Compass Minerals has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201.    Plaintiff, on behalf of Compass Minerals, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Compass Minerals in a manner consistent with the operations of a publicly held corporation.

204.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Compass Minerals has sustained and will continue to sustain significant damages.

205.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

206.    Plaintiff, on behalf of Compass Minerals, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

207.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

209.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Compass Minerals to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211.    Plaintiff, on behalf of Compass Minerals, has no adequate remedy at law.

### SIXTH CLAIM

**Against Defendants Malecha, Standen, and Sepich for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.    Compass Minerals and Defendants Malecha, Standen, and Sepich are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Malecha's, Standen's, and Sepich's willful and/or reckless violations of their obligations as officers and/or directors of Compass Minerals.

214.    Defendants Malecha, Standen, and Sepich, because of their positions of control and authority as officers and/or directors of Compass Minerals, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Compass Minerals, including the wrongful acts complained of herein and in the Securities Class Action.

215.    Accordingly, Defendants Malecha, Standen, and Sepich are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

216.    As such, Compass Minerals is entitled to receive all appropriate contribution or indemnification from Defendants Malecha, Standen, and Sepich.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Compass Minerals, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Compass Minerals;

(c)    Determining and awarding to Compass Minerals the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Compass Minerals and the Individual Defendants to take all necessary actions to reform and improve Compass Minerals' corporate governance and internal procedures to comply with applicable laws and to protect Compass Minerals and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Compass Minerals to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Compass Minerals restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 30, 2024                Respectfully Submitted,

**WALTERS RENWICK RICHARDS
SKEENS & VAUGHAN, P.C.**
By: */s/ Karen Wedel Renwick*
Karen Wedel Renwick, D. Kan #12095
R. Frederick Walters, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, Missouri  64105
Telephone: (816) 421-6620
Fax: (816) 421-4747
krenwick@wrrsvlaw.com
fwalters@wrrsvlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

## VERIFICATION

I, Fabrizio Morelli, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20 ___ day of October, 2024.

Firmato da:

*Fabrizio Morelli*

07F1680DFCFB43E...

Fabrizio Morelli